15-2714-cv(L)
*Anderson News, L.L.C. v. American Media, Inc.*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term, 2016

(Argued: December 2, 2016     Decided: July 19, 2018)

Docket Nos. 15-2714-cv(L), 15-2889-cv(XAP), 15-2894-cv(XAP), 15-2903-cv(XAP)

ANDERSON NEWS, L.L.C.,

*Plaintiff–Counter-Defendant–*
*Appellant–Cross-Appellee,*

LLOYD T. WHITAKER, as the Assignee under an Assignment for the Benefit of Creditors for Anderson Services, L.L.C.,

*Plaintiff–Appellant,*

–v.–

AMERICAN MEDIA, INC., TIME INC., HEARST COMMUNICATIONS, INC.,

*Defendants–Counter-Claimants–*
*Appellees–Cross-Appellants,*

BAUER PUBLISHING CO., LP., CURTIS CIRCULATION COMPANY, DISTRIBUTION SERVICES, INC., HACHETTE FILIPACCHI MEDIA, U.S., INC., KABLE DISTRIBUTION SERVICES, INC., RODALE, INC., TIME WARNER RETAIL SALES & MARKETING, INC.,

*Defendants–Appellees,*

HUDSON NEWS DISTRIBUTORS LLC, THE NEWS GROUP, LP,

*Defendants,*

–v.–

CHARLES ANDERSON, JR.,

*Counter-Defendant–Cross-Appellee.*

_____

B e f o r e :

LIVINGSTON, CHIN, and CARNEY, *Circuit Judges.*

_____

Plaintiffs-appellants Anderson News, L.L.C., and Anderson Services, L.L.C., (together, "Anderson") appeal from an award of summary judgment to defendants on Anderson's allegation that, in early 2009, defendants conspired to boycott Anderson and drive it out of business, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. Anderson provided wholesaler services to the single-copy magazine industry: it was responsible for collecting single-copy magazines from publishers, delivering those magazines to retailers, accounting for the number of magazines sold, and recycling unsold magazines. In mid-January 2009, Anderson proposed charging publishers a delivery surcharge of $0.07 per magazine shipped, and called for publishers' agreement to the surcharge before February 2009 "to ensure future distribution." Defendants-appellees, a group of publishers and their distributors (which provide marketing and logistics services to the publishers), refused to pay the proposed surcharge and found wholesalers other than Anderson to deliver their magazines. Anderson sued the publishers and distributors, alleging a conspiracy in violation of antitrust laws to boycott Anderson and making various related state law claims. Some defendants counterclaimed, alleging that Anderson's proposed surcharge was itself the result of an unlawful conspiracy to raise prices.

The District Court granted summary judgment to defendants on Anderson's antitrust and state law claims, and to Anderson on the counterclaims. Reviewing the

evidence in light of the totality of the circumstances and under the *Matsushita* "tends to exclude" standard, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986), we conclude that the District Court correctly ruled that Anderson has failed to offer sufficient evidence from which a reasonable jury could infer that defendants entered into such an unlawful agreement. We further conclude that the District Court correctly ruled that defendants did not suffer an antitrust injury and therefore lacked antitrust standing to pursue the stated counterclaims.

AFFIRMED.

––––––––––––

MICHAEL K. KELLOGG (Joshua D. Branson, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC; Marc E. Kasowitz, Hector Torres, Seth Davis, Kasowitz, Benson, Torrest & Friedman LLP, New York, NY, *on the brief*), Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, DC, *for Plaintiff–Counter-Defendant–Appellant–Cross-Appellee Anderson News L.L.C. and Counter-Defendant–Cross-Appellee Charles Anderson, Jr.*

Thomas P. Lynch, Lynch Rowin LLP, New York, NY, for *Plaintiff–Appellant Lloyd T. Whitaker, as the Assignee under Assignment for the Benefit of Creditors of Anderson Services, L.L.C.*

DAVID G. KEYKO (Eric Xinis Fishman, *on the brief*), Pillsbury Winthrop Shaw Pittman LLP, New York, NY, *for Defendant–Counter-Claimant–Appellee–Cross-Appellant American Media, Inc., and Defendant–Appellee Distribution Services, Inc.*

DANIEL N. ANZISKA, Kevin P. Wallace, Troutman Sanders LLP, New York, NY, *for Defendant–Appellee Bauer Publishing Co., LP.*

GEORGE G. GORDON (Jennings Durand, *on the brief*), Dechert LLP, Philadelphia, PA, *for Defendant–Appellee Curtis Circulation Company*.

JAY A. KATZ (Isaac Michael Bayda, *on the brief*), McElroy, Deutsch, Mulvaney & Carpenter, LLP, New York, NY, *for Defendant–Appellee Kable Distribution Services, Inc.*

JOHN M. HADLOCK (Alexander Lycoyannis, *on the brief*), Rosenberg & Estis, P.C., New York, NY, *for Defendant– Appellee Rodale, Inc.*

ROWAN D. WILSON (Thomas G. Rafferty, Antony L. Ryan, *on the brief*), Cravath, Swaine & Moore LLP, New York, NY, *for Defendant–Counter-Claimant–Appellee–Cross- Appellant Time Inc. and Defendant–Appellee Time Warner Retail Sales & Marketing, Inc.*

Jonathan R. Donnellan, Eva M. Saketkoo, Hearst Corporation, Office of the General Counsel, New York, NY, *for Defendant–Counter-Claimant–Appellee– Cross-Appellant Hearst Communications, Inc. (as successor-in-interest to Appellee Hachette Filipacchi Media U.S., Inc.).*

SUSAN L. CARNEY, *Circuit Judge*:

Plaintiffs-appellants Anderson News, L.L.C., and Anderson Services, L.L.C., (together, "Anderson") appeal from an award of summary judgment to defendants on Anderson's allegation that, in early 2009, defendants conspired to boycott Anderson and drive it out of business, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. At the time, Anderson provided wholesaler services to the single-copy magazine industry, in which magazines are published and sold individually to consumers (in

4

contrast to sales by subscription). As a wholesaler, Anderson was responsible for collecting single-copy magazines from publishers, delivering those magazines to retailers, accounting for the number of magazines sold, and recycling unsold magazines.

In an effort to decrease the financial burden imposed on it by publishers' practice of shipping many more magazines than are sold, in mid-January 2009 Anderson announced that it would begin charging publishers a delivery surcharge of $0.07 per magazine shipped, and called for agreement to the surcharge before February 2009 "to ensure future distribution." J.A. 1450.[1] Defendants-appellees, a group of publishers and their distributors (which provide marketing and logistics services to the publishers), refused to pay the proposed surcharge and found wholesalers other than Anderson to deliver their magazines. Anderson sued the publishers and distributors, alleging a conspiracy in violation of antitrust laws to boycott Anderson and making various related state law claims. Some defendants counterclaimed, alleging that Anderson's proposed surcharge was itself the result of an unlawful conspiracy to raise prices.

The District Court granted summary judgment to defendants on Anderson's antitrust and state law claims, and to Anderson on the counterclaims. Anderson now argues that the District Court ignored or too heavily discounted much of the evidence that Anderson presented in support of its claims, and maintains that it has offered sufficient evidence from which a jury could reasonably conclude that defendants entered into an unlawful agreement to refuse to deal with Anderson and to drive it out of business. Reviewing the evidence in light of the totality of the circumstances and

---

[1] Citations to "J.A." refer to the parties' Deferred Joint Appendix. Citations to "C.A." refer to the parties' Deferred Confidential Joint Appendix, which has been filed under seal.

5

under the *Matsushita* "tends to exclude" standard, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986), we conclude that the District Court correctly ruled that Anderson has failed to offer sufficient evidence that defendants entered into the alleged unlawful agreement to survive defendants' motions for summary judgment. We further decide that the District Court was correct in ruling that defendants did not suffer an antitrust injury and thus lacked antitrust standing to pursue the stated counterclaims. We therefore AFFIRM the District Court's judgments.

## BACKGROUND

### I. Factual background

The following statement of facts is drawn from the District Court's thorough recitation, supplemented by the parties' statements of undisputed fact under Federal Rule of Civil Procedure 56.1 and primary documents such as emails and other correspondence that are contained in the record. Although significant changes have doubtless since transpired, we describe relevant facts in this industry as they stood in 2008-2009, when the events in question occurred, as reflected by the record evidence.

In the United States, in 2009, publishers primarily sold magazines in two ways: by subscription and by single-copy purchase at a newsstand, supermarket, or another retailer. The single-copy magazine industry, which is our focus in this case, had long operated through four distinct levels of enterprise:

First, publishers created and produced magazines. Defendants Time Inc. ("Time"), American Media, Inc. ("AMI"), Bauer Publishing Co., LP. ("Bauer"), Rodale, Inc. ("Rodale"), and Hachette Filipacchi Media, U.S., Inc. ("Hachette") published a variety of magazines ranging from familiar titles like *People* and *Star* to more obscure

6

titles like *Yikes!* and *Twist*. As of 2008, just before the events at issue here took place, sales of defendants' magazines constituted 42% of the U.S. single-copy market.

Second, distributors provided a variety of services, including marketing and billing services, to publishers. In 2008, four major distributors operated in the United States: defendants Time/Warner Retail Sales & Marketing, Inc. ("TWR"), Curtis Circulation Company ("Curtis"), Kable Distribution Services, Inc. ("Kable"), and non-defendant Comag. TWR represented only Time; Kable represented Bauer; Curtis represented Rodale, AMI, and Hachette; and defendant Distribution Services, Inc. ("DSI"), a wholly owned subsidiary of AMI, provided consulting and marketing services to AMI, Bauer, Rodale, and Hachette. Together, TWR, Curtis, and Kable served as national distributors for 75% of the single-copy magazine market in 2008.

Third, wholesalers served as middlemen between publishers and retailers. Wholesalers received magazines from publishers, delivered magazines to retailers, and set up in-store displays of those magazines for retailers. Once the magazines reached their "off-sale" date (that is, they were no longer current), wholesalers retrieved and disposed of the unsold magazines. In 2008, the U.S. market was occupied by four major wholesalers: Anderson News, Source Interlink Distribution, L.L.C. ("Source"), The News Group, LP ("TNG"), and Hudson News Distributors LLC ("Hudson"). As of late 2008, these wholesalers together distributed 93% of magazines in the single-copy market, and Anderson News served as wholesaler for approximately 30% of all single-copy magazines distributed in the United States.

As an ancillary matter, many wholesalers used logistics affiliates to coordinate the wholesalers' delivery and disposal services. Anderson Services was Anderson News's logistics affiliate. Many wholesalers also engaged delivery services to deliver

7

magazines to retailers. Anderson Services and TNG's logistics affiliate shared ownership of two such services: ProLogix Distribution Services (East), LLC ("ProLogix East") and ProLogix Distribution Services (West), LLC ("ProLogix West").

At the fourth distinct level, retailers sold magazines to customers. During the relevant period, key retailers in the nation included Wal-Mart Stores, Inc. ("Wal-Mart") and The Kroger Co. ("Kroger"). To reduce their logistical costs, retailers generally demanded that all of their retail outlets be serviced by a single wholesaler.

Before the early 2000s, single-copy magazines moved through each level of the industry as follows: Publishers sold magazines to wholesalers at a certain discount from the cover price. Wholesalers in turn sold magazines to retailers at a slightly lower discount, and retailers sold to consumers at the cover price. Wholesalers collected unsold magazines and refunded retailers for them. Publishers then refunded wholesalers for unsold magazines. As the District Court recognized, even with a buy-back guarantee, publishers had an incentive to and therefore did sell wholesalers more magazines in the first instance than are likely to be bought, to prevent retailers from experiencing a shortfall and thereby missing out on potential sales. This overselling practice imposed a burden on wholesalers, which then had to retrieve and account for the unsold magazines.

In the early 2000s, retailers implemented a new accounting and payment method called scan-based trading. In this method, retailers obtain magazines from wholesalers on a consignment basis. They then track sales precisely by using bar codes, and they do not pay wholesalers for magazines until the magazines are actually sold to consumers. This eases the wholesalers' burden of tracking the numbers of unsold magazines at retail outlets. It also, however, forces wholesalers to bear related inventory costs—the

cost of magazines sitting on the shelves—because wholesalers must purchase magazines from publishers up front and receive no payment from retailers for those magazines until they are sold.

In January 2009, in an attempt to shift these costs further up the supply chain to publishers, and after some years of debate in the industry on related practices, Anderson—which enjoyed a 30% market share of the wholesaler business—decided to announce that publishers would from that time on be required to assume the inventory costs and pay a surcharge of $0.07 on each magazine that Anderson delivered to retailers on their behalf (the "Program"). Anderson had in the past tried to shift these costs to publishers, but without success: the publishers had resisted its efforts. Given these prior failures, Anderson formulated a new strategy to force publishers to accept the surcharge. This strategy had two parts: First, Anderson obtained commitments from Wal-Mart and Kroger, the two biggest single-copy magazine retailers, to refuse to accept shipments from wholesalers other than Anderson during Anderson's short-fuse negotiations with the publishers. Second, Anderson Services planned to use its ownership share in one of its logistics affiliates, ProLogix East, to pressure publishers by suspending delivery services for all publishers' magazines to retailers within ProLogix East's delivery areas until recalcitrant publishers gave in and agreed to pay the surcharge. These combined actions, Anderson reasoned, would move publishers by depriving them of single-copy magazine income until they and Anderson reached an accord.

Anderson launched its plan in mid-January 2009. On January 12 and 13, Charles Anderson, Jr., the owner of Anderson News and manager of Anderson Services, met privately with a number of publishers, including defendants Time, AMI, and Bauer, and

outlined his proposed cost-shifting measures and the $0.07 surcharge. On January 14, Mr. Anderson publicly announced the Program in a conference call hosted by a magazine-industry publication. During the conference call, Mr. Anderson explained his reasons for implementing the Program as stemming in part from how "over the last 10 years [Anderson's] profits have eroded to nothing and into significant losses . . . so we think that the time has come to make some significant changes so that we can continue as a viable, cost effective method of distributing magazines." J.A. 919. When asked whether the publishers' acceptance of the Program would result in a "financially sound magazine distribution channel," though, Mr. Anderson was unable to provide any reassurances about his company's viability: "I can't tell you what the future holds as no one can with unemployment going the way it is. With the factors that we've got today, I'm just not going to predict it." *Id.* at 931. Mr. Anderson was also challenged about the timing of his Program, given the "distress[ed] situation of publishing" and the public announcement made the previous day that "advertising pages for the last quarter of the year fell by 17%, 11% for the whole year . . . ." *Id.* at 926-27. He was asked, "[I]s your request for very substantial publishing financial commitment, is this a good time for it?" *Id.* Mr. Anderson responded, "I am fully cognizant of what is going on in the industry. . . . We know how difficult it is. It's not that we want to do anything like this, is the timing good? Of course not. But now is the time that we have to do this." *Id.* Moreover, Mr. Anderson seemed to suggest that the $0.07 per copy surcharge was not a negotiable figure, noting, "[I]f we negotiated the rate then it would not be fair so the answer is we really believe that the 7 cent number is the number." *Id.* at 922. Mr. Anderson then confirmed that if publishers did not agree to the Program, Anderson would refuse to ship magazines for those publishers as of February 1. *Id.* at 922-23. And

10

finally, he noted the possibility that Anderson might exit the business if not enough publishers signed on to his Program: "[W]hy should we continue to lose money in a business that doesn't . . . give us any return?" *Id.* at 927-28.

On the heels of the announcement, the president of Anderson News, Frank Stockard, wrote to publishers giving them a deadline of January 23 to agree to the proposed surcharge "to ensure future distribution" in February and, implicitly, thereafter. J.A. 1450. Concurrently with Anderson's announcements, by letter dated January 19, Source (a wholesaler in competition with Anderson) wrote to at least several publishers announcing that it, too, would impose a $0.07 surcharge on each magazine it distributed. These announcements followed several phone calls between Mr. Anderson and Source President James Gillis in December 2008 and January 2009.

Anderson's announcement sparked a flurry of communications between and among defendants and between defendants and non-parties, as described in detail by the District Court. *See Anderson News, L.L.C. v. American Media, Inc.* (*Anderson III*), 123 F. Supp. 3d 478, 492-94, 504-08 (S.D.N.Y. 2015). Emails, telephone records, and testimony introduced by Anderson reflect that during the short period between Anderson's announcement and the February 1 deadline that it declared, defendant publishers and defendant distributors discussed the proposed surcharge and their planned responses in various settings: defendants discussed it internally; defendant publishers discussed it with their affiliated distributors; defendants discussed it with non-defendant wholesalers and retailers; and defendants discussed it with their direct competitors. Anderson conceded at oral argument before the District Court that "many communications between [distributors and their publisher-clients] were not simply permissible, but necessary—it was critical for Publisher Defendants to communicate

11

with their distributors regarding their responses to the Anderson proposal, and for the Distributor Defendants to discuss the proposal with their publisher clients." *Id.* at 492.

During the short time period between Anderson's January 14 announcement and the February 1 deadline, the defendants' actions varied. When Mr. Anderson described his individual meetings with certain defendants to inform them of the Program on January 12 and 13, Mr. Anderson observed that in contrast to his meetings with Time, AMI, and Hachette, which were "open" and "there was good dialogue," Bauer's immediate reaction was "[N]o, we're not going to do it, absolutely not. And it was firm, it was very, very firm . . . . [I]t was not open dialogue." J.A. 172-73. On January 26, Anderson sent another letter to address "common misconceptions" regarding its Program. In that letter, Anderson asked publishers to respond by January 28, and emphasized that, although "Anderson has made proposals like this in the past," it was not "bluffing" with the current proposal now that "Anderson [had been] forced to take urgent action on its own." C.A 300. Thus, as the February 1 deadline approached, many other defendants attempted to negotiate with Anderson: Curtis CEO Robert Castardi reached out to Anderson News President Frank Stockard at least a few times, noting in an email, "I have been asking for discussions with [Anderson] for the past week; to no avail." J.A. 640, 793, 795, 801. An internal email between Stockard and Mr. Anderson noted that Castardi was "trying to help." *Id.* at 795. The record also suggests that Kable expressed willingness to negotiate with Anderson. *Id.* at 131, 1567. Time and TWR seemed to come closest to an agreement with Anderson: On January 27, 2009, TWR requested a deadline extension while offering to provide a two-point discount on Time magazines. That same day, Mr. Anderson rejected Time's proposed deal. Notably, two

12

days after rejecting Time/TWR's request for an extension, Anderson entered into an arrangement similar to that proposed by Time with another publisher, Comag.

By February 1, Hachette and Rodale agreed to pay the proposed surcharge on certain titles for the month of February, and Curtis continued to facilitate shipments on behalf of Hachette and Rodale after the February 1 deadline. AMI continued to ship some of its monthly magazines for February on uncertain terms (although it made alternative arrangements for its other magazines). Time, Hachette, and Bauer ended up rejecting Anderson's proposed surcharge and made alternative shipping arrangements for their magazines in February: they each would ship through TNG instead of Anderson. No defendant agreed before the February 1 deadline to pay the surcharge on a long-term basis. The defendants were not alone in making this decision: Ultimately, 1,484 of 1,570 publishers, or approximately 95% of all publishers nationwide, had not agreed to Anderson's terms as of February 1, 2009.

In the face of this general reaction, immediately after February 1, Anderson implemented what it called its "going dark" strategy—conveying an ultimatum, in a last-ditch effort to convince the publishers to accept the surcharge. It reaffirmed that key retailers Wal-Mart and Kroger would not accept magazines from wholesalers other than Anderson in February and on Saturday, February 7, it announced by press release that on Monday, February 9, its affiliate ProLogix East would halt magazine deliveries to retailers, including deliveries for major wholesaler TNG.

In response, a TNG subsidiary brought suit in the United States District Court for the District of Delaware, seeking a temporary restraining order that would require ProLogix East to deliver TNG's magazines to retailers pending adjudication of its claims against Anderson. On February 9, 2009, the court issued the requested order. According

13

to Mr. Anderson, the issuance of this temporary restraining order meant "game over" for Anderson News. J.A. 225. Soon after, in March 2009, Anderson ceased doing business altogether and began bankruptcy proceedings.

## II. Procedural history

On March 10, 2009, Anderson News and Anderson Services filed a complaint in the United States District Court for the Southern District of New York, naming AMI, Bauer, Curtis, DSI, Hachette, Kable, Rodale, Time, and TWR as defendants. They alleged: first, an unlawful group boycott of Anderson in violation of the Sherman Act, 15 U.S.C. § 1; second, tortious interference with business relationships and contracts; and third, civil conspiracy.[2]

Defendants successfully moved under Rule 12(b)(6) to dismiss the complaint. *Anderson News, L.L.C. v. American Media, Inc.* (*Anderson I*), 732 F. Supp. 2d 389 (S.D.N.Y. 2010). The District Court concluded that the complaint failed to state a claim because it was "implausible that magazine publishers would conspire to deny retailers access to their own products" and "completely plausible" that their respective decisions to use other wholesalers were "unchoreographed behavior, a common response to a common stimulus." *Id.* at 397-99. The District Court also dismissed Anderson's state law claims, ruling that by failing adequately to plead an antitrust violation, the complaint also failed to state a claim for tortious interference and civil conspiracy. Further finding that "[t]he context of the alleged antitrust conspiracy—the Surcharge that Anderson tried to impose on the industry to Anderson's advantage and the disadvantage of everyone

---

[2] Anderson's initial complaint also included TNG and Hudson as defendants. Anderson voluntarily dismissed its claims against TNG within days of filing the complaint. Over four years later, in December 2013, it settled its claims against Hudson and voluntarily dismissed its claims against that defendant.

14

else—belies the viability of Anderson's antitrust claim," the District Court denied Anderson leave to replead. *Id.* at 405.

Anderson appealed, and in 2012 we vacated the District Court's dismissal and remanded for further proceedings, ruling that Anderson should have been permitted to file an amended complaint. *Anderson News, L.L.C. v. American Media, Inc.* (*Anderson II*), 680 F.3d 162 (2d Cir. 2012). We decided that the allegations made in Anderson's proposed amended complaint were "sufficient to suggest that the cessation of shipments to Anderson resulted not from isolated parent-subsidiary agreements but rather from a lattice-work of horizontal and vertical agreements to boycott Anderson." *Id.* at 189. Although "presentation of a common economic offer may well lend itself to innocuous, independent, parallel responses," we explained, "it does not provide antitrust immunity to respondents who get together and agree that they will boycott the offeror." *Id.* at 192. We also rejected the District Court's conclusion that, at the motion-to-dismiss stage, the alleged conspiracy was not plausible because it would not be in the defendant publishers' self-interest. We ruled that defendants might plausibly see some benefit from such a conspiracy: the complaint's allegations made it possible that "the publishers and distributors would feel comfortable dealing with just two wholesalers," especially if, as alleged, those wholesalers were also members of the alleged conspiracy. *Id.* at 193-94.

On remand, in September 2012, Anderson filed an amended complaint and the parties proceeded to discovery. After two years of discovery, defendants moved for summary judgment and Anderson cross-moved for summary judgment on counterclaims filed by AMI, Hearst Communications, Inc. ("Hearst") (as successor to Hachette), and Time, in which those defendants charged Anderson with engaging in an

15

illegal price-fixing conspiracy and unlawfully inducing retailers to boycott non-compliant publishers.

In August 2015, the District Court granted summary judgment for defendants. *Anderson III*, 123 F. Supp. 3d at 512. On what had become a robust factual record, the District Court reiterated its earlier view that Anderson's allegations were not plausible and that it was Anderson's "own ill-conceived and badly executed plan [that] led to its downfall." *Id.* at 486. The District Court observed that, despite extensive discovery, Anderson had not presented any direct evidence that defendants agreed to boycott Anderson. *Id.* at 485. Particularly on such an implausible claim, Anderson had failed to offer the "strong direct or circumstantial evidence" required to survive summary judgment, the District Court ruled. *Id.* at 508 (citation omitted).

In conjunction with its merits decision, the District Court issued a separate opinion and order in which it granted in part defendants' motion to exclude some of the testimony offered by one of Anderson's experts, Dr. Leslie Marx. *Anderson News, L.L.C. v. American Media, Inc.* (*Anderson IV*), No. 09 Civ. 2227, 2015 WL 5003528 (S.D.N.Y. Aug. 20, 2015). As relevant to the present appeal, the District Court excluded Dr. Marx's testimony in which she averred "that it was in each [d]efendant's independent economic self-interest to continue to supply Anderson News with magazines," *id.* at *3, because, in its view, the testimony did not contain "any actual analysis regarding [d]efendants' financial incentives to continue supplying Anderson News with magazines," *id.* at *4, and was based solely on Dr. Marx's interpretation of defendants' statements.

On AMI, Hearst, and Time's counterclaims, the District Court granted summary judgment to Anderson. Defendants argued that Anderson and Source's proposed

16

surcharge was the result of an illegal price-fixing agreement between the two wholesalers that was injurious to defendants. *Anderson III*, 123 F. Supp. 3d at 511. The District Court rejected defendants' arguments, concluding that even if Anderson and Source had so conspired, AMI, Hearst, and Time lacked antitrust standing to press the complaint because they had "not suffered damages of the type the antitrust laws were intended to prevent." *Id.* at 512 (internal quotation marks omitted).

Anderson's timely appeal followed, as did the cross-appeal filed by AMI, Hearst, and Time.

**DISCUSSION**

We review the District Court's grants of summary judgment *de novo*, and "will affirm only if, after construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inference in its favor, . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *In re Publ'n Paper Antitrust Litig.* (*Publ'n Paper*), 690 F.3d 51, 61 (2d Cir. 2012) (internal quotation marks and citation omitted).

I. **Sherman Act claim**

Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is . . . illegal." 15 U.S.C. § 1. To prove a Section 1 claim, a plaintiff must present evidence of "a combination or some form of concerted action between at least two legally distinct economic entities" in the form of "a conscious commitment to a common scheme designed to achieve an unlawful objective." *United States v. Apple, Inc.*, 791 F.3d 290, 313, 315 (2d Cir. 2015) (internal quotation marks omitted). Once it has sufficiently

demonstrated the existence of an agreement, the plaintiff must then establish that the agreement's objective was an "unreasonable restraint of trade either per se or under the rule of reason." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993). "Only after an agreement is established will a court consider whether the agreement constituted an unreasonable restraint of trade." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 232 (2d Cir. 1999).

All parties on appeal accept that the group boycott alleged (to decline to deal with Anderson and thereby reduce wholesaler competition by putting Anderson out of business) would be illegal. *See Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212 (1959). At issue here, then, is whether Anderson has presented sufficient evidence for a jury reasonably to conclude that defendants shared a "conscious commitment" to such an agreement. *Apple*, 791 F.3d at 315; *see also Anderson II*, 680 F.3d at 183 ("Circumstances must reveal 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984))). Anderson claims that defendants ceased doing business with Anderson under an agreement aimed at driving Anderson out of business and reducing competition in the wholesaler market. Defendants counter that they each ceased doing business with Anderson because they each did not want to pay the proposed "above-market" price resulting from the surcharge. Anderson must therefore make the "threshold showing" that a reasonable jury could find that defendants' conduct—concurrently refusing to pay the surcharge and ceasing to do business with Anderson—was the result of an agreement intended to reduce competition in the wholesaler market, rather than defendants' independent decisions. *AD/SAT*, 181 F.3d at 233.

18

In the field of antitrust law, "summary judgment serves a vital function"—it "avoid[s] wasteful trials and prevent[s] lengthy litigation that may have a chilling effect on pro-competitive market forces." *Publ'n Paper*, 690 F.3d at 61. "[S]ummary judgment is not a substitute for a trial," and so if "the evidence admits of competing permissible inferences with regard to whether a plaintiff is entitled to relief," summary judgment should be denied. *Id*. Although we review the evidence of an alleged conspiracy in the light most favorable to the non-moving party (here, Anderson), "antitrust law limits the range of permissible inferences from ambiguous evidence." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). To permit an inference of conspiracy based on ambiguous evidence—that is, "evidence that is equally consistent with independent conduct as with illegal conspiracy," *Apple*, 791 F.3d at 315—would "deter or penalize perfectly legitimate" and procompetitive conduct. *Monsanto*, 465 U.S. at 763; *see also Matsushita*, 475 U.S. at 593.

Accordingly, to raise a genuine issue of material fact as to an antitrust conspiracy, the plaintiff must present direct or circumstantial evidence that "tends to exclude the possibility that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588 (internal quotation marks omitted). This "[does] not mean that the plaintiff must disprove all nonconspiratorial explanations for the defendants' conduct"; rather, the evidence need be sufficient only "to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not." *Publ'n Paper*, 690 F.3d at 63 (quoting Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 14.03(b), at 14-25 (4th ed. 2011) (Areeda & Hovenkamp, *Fundamentals*)). Thus, if the evidence is in equipoise, then summary judgment must be granted against the plaintiff: "The question is not . . . whether the plaintiff's inferences are so far-fetched that a trier

19

of fact should not be allowed to consider them, but whether the evidence, though not far-fetched, sufficed to me[e]t the plaintiff's burden of proof." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 308, at 156-57 (4th ed. 2011) (Areeda & Hovenkamp, *Antitrust Law*) (internal quotation marks and citation omitted).

Anderson claims that on January 15, 2009, the defendants entered into an illegal agreement with each other to drive Anderson out of business and to reduce competition in the wholesaler market. *See* Areeda & Hovenkamp, *Antitrust Law*, ¶ 1409, at 64 (noting that to avoid confusion when considering the validity of an antitrust conspiracy claim, we must "ask precisely, 'Who was in agreement with whom and about what?'"). Defendants counter that, after attempting to negotiate the terms of the Program, evaluating how much the Program would cost, gathering industry information, and considering alternative wholesaler options, they each independently rejected the terms of Anderson's Program in favor of hiring an alternative, lower-cost wholesaler. Anderson must therefore present sufficient evidence to show that a reasonable jury could determine that defendants' rejection of Anderson's Program *more likely than not* occurred as a result of an illegal agreement among defendants, rather than due to each defendant's independent business decision to seek a lower cost alternative. If, however, we determine that "the proffered evidence is equally consistent with competition and collusion, then no fact issue of collusion is established," and we must rule in favor of defendants. *Id.* ¶ 308, at 170-71.

### A. The alleged agreement

Before considering the evidence Anderson offers to support its allegation that defendants' conduct was the result of an unlawful agreement rather than independent action, we pause to examine the nature of the alleged agreement itself. We do so

20

because, as we explained in *Publication Paper*, the quality of the evidence required to satisfy *Matsushita*'s "tends to exclude" standard varies with the economic "plausibility" of the alleged agreement:

> [W]here a plaintiff's theory of recovery is implausible, it takes strong direct or circumstantial evidence to satisfy *Matsushita*'s tends to exclude standard. By contrast, broader inferences are permitted, and the tends to exclude standard is more easily satisfied, when the conspiracy is economically sensible for the alleged conspirators to undertake and the challenged activities could not reasonably be perceived as procompetitive.

*Publ'n Paper*, 690 F.3d at 63 (internal quotation marks and citations omitted; italics added); Areeda & Hovenkamp, *Antitrust Law*, ¶ 308, at 170-71 ("[G]iven evidence must [not] be treated precisely the same way in all cases. . . . [T]he 'range of permissible conclusions' that a fact finder might draw becomes larger as the alleged conspiracy becomes more economically plausible." (quoting *Matsushita*, 475 U.S. at 596-97)). Accordingly, where context reveals that the alleged agreement is one that "simply makes no economic sense," the plaintiff "must come forward with more persuasive evidence to support its claim than would otherwise be necessary." *AD/SAT*, 181 F.3d at 235 (internal quotations marks and alterations omitted).

In its amended complaint, Anderson alleged that defendants entered into an "anti-competitive and collusive scheme . . . to destroy" Anderson. J.A. 66. Anderson's asserted rationale for the scheme was that defendants aimed "to avoid individualized and competitive negotiations" with Anderson over the proposed surcharge and to "increase their control over the wholesaler single-copy magazine distribution market." *Id.* With this increased control of distribution, Anderson argued, defendants could

21

"ensure that the increasing costs of magazine distribution were covered by retailers instead of publishers." *Id.* at 78.

At first glance, this rationale appears to make "no economic sense." *AD/SAT*, 181 F.3d at 235 (quoting *Matsushita*, 475 U.S. at 587). Publishers rely on wholesalers to deliver their magazines to retailers. Reducing competition in the wholesaler market appears to increase the market power of the remaining wholesalers, and therefore seems likely to embolden those remaining to charge higher prices to all their commercial partners—publishers included—and not just to retailers. On just this reasoning, in fact, the District Court has twice rejected Anderson's theory as not plausible, concluding that defendants would have nothing to gain from Anderson's demise. *See Anderson I*, 732 F. Supp. 2d at 397 ("Publishers and national distributors have an economic self-interest in more wholesalers, not fewer; more wholesalers yields greater competition, which is good for suppliers."); *Anderson III*, 123 F. Supp. 3d at 501 ("[The] evidence strongly suggests that Defendants wanted more, rather than fewer, wholesalers in the single-copy market, because more wholesalers meant more competition for both retailers' and publishers' business—resulting in more favorable terms for Defendants.").

Anderson's theory that defendants could benefit from Anderson's demise is not completely indefensible, however. The near-term goal of the alleged conspiracy would be relatively easy to accomplish: given the description Anderson gave of its poor financial health in the January 2009 conference call, it was likely that defendants needed to deprive Anderson of magazines for only a short while to secure its demise. In addition, theoretically, the longer-term goal of the alleged conspiracy—reduced competition in the wholesaler market—could have benefited defendants. We suggested

22

as much in our decision vacating the District Court's dismissal of Anderson's claim, where we noted that publishers and distributors might benefit from reduced competition in the wholesaler market if the remaining wholesalers chose to "increase their profits by raising prices to retailers [only]," rather than by "increas[ing] charges to the publishers." *Anderson II*, 680 F.3d at 194.

But on summary judgment, evidence of key facts that would support this theory have not materialized. Notably absent is evidence supporting Anderson's allegation that wholesalers Hudson and TNG were involved in defendants' alleged conspiracy. Although we previously observed at the pleading stage that the alleged conspiracy could be plausible, we emphasized in that opinion the significance of that allegation, and Anderson has now voluntarily dismissed its claims against the wholesalers. *Id.* at 193-94.[3] Thus, the primary evidence now offered in support of Anderson's theory that reduced wholesaler competition would benefit defendants is an expert analysis prepared by an economist, Dr. Leslie Marx. But Dr. Marx's analysis not only fails to demonstrate how defendants would benefit, it also seems to suggest that defendants would ultimately be harmed by reduced wholesaler competition.

First, Dr. Marx's report recognizes that reduced competition in the wholesaler market would result in higher prices, but opines that wholesalers would raise prices only to retailers. She explains that the economic literature on "multi-sided markets"—markets with middlemen or "platforms," such as wholesalers in the single-copy

---

[3] We note further that our observation in requiring that Anderson be allowed to amend its complaint was not determinative of the conspiracy's ultimate "plausibility," because "[a]t the pleading stage . . . the complaint need not offer a plausible reason for the defendants' conspiracy but 'merely needs to allege that they did indeed conspire and give some factual allegations that would support such a claim.'" Areeda & Hovenkamp, *Antitrust Law*, ¶ 308, at 174 n.101.

23

magazine market—suggests that it is "possible that an increase in the market power of platforms leads to higher prices on one side of the market, while having a much smaller impact on prices on the other side." C.A. 1874. She further explains that the side most likely to bear higher prices is the side that "always chooses to do business with only one platform," *id.* at 1874-75—here, the large retailers, which historically have had a practice of preferring an exclusive relationship with a single wholesaler. Dr. Marx also offers some evidence suggesting that retailers may have paid higher prices for magazines after Anderson's exit from the market, *see id.* at 1945, and states that national distributors had, in the past, "preferred to have magazines wholesaled by a single firm in a given location," *id.* at 1877-78.

In light of the multi-sided market theory presented in Dr. Marx's report, we cannot dismiss Anderson's theory of possible benefit to the publishers as "ridiculous," as the District Court concluded. *Anderson III*, 123 F. Supp. 3d at 508. But even assuming that reduced wholesaler competition would result in higher prices for retailers only, Dr. Marx offers no evidence suggesting that publishers would (or did) in fact experience net benefits as a result. Such a theory is sufficiently speculative to make the alleged conspiracy economically implausible. Whether any benefits of the alleged conspiracy would accrue to defendants under Dr. Marx's theory seems to depend entirely on the wholesalers' benevolence: even if the wholesalers remaining after Anderson's demise would demand higher prices from retailers, Dr. Marx offers no basis for concluding that they would necessarily pass along the fruits of their increased margin to publishers, or refrain from demanding more up the chain from publishers as well.

Second, Dr. Marx's report actually acknowledges that reducing wholesaler competition was risky for the publishers because "the remaining wholesalers . . . might

24

eventually seek to extract more money from publishers as well as retailers." C.A. 1873-74. In fact, even Dr. Marx's assertion that the defendants could achieve some benefit by avoiding the "full cost" of Anderson's Program is explicitly qualified by the observation that the defendants might need to "make some concessions to wholesalers that remained." *Id.* at 1873. Such concessions could, of course, include the very same higher-cost terms required by Anderson's Program.

Finally, even if we credit Dr. Marx's assumption of wholesaler benevolence, her report also explains how higher prices for retailers would *harm* publishers by reducing the sales of single-copy magazines as a whole. She observes that some retailers have completely stopped selling single-copy magazines, and predicts that other retailers would likely "reallocate shelf space to other alternative products." C.A. 1964. Any such reduction in retailer sales of single-copy magazines would translate directly into reduced sales for publishers, too. In fact, while trying to convince publishers to sign on to its Program, Anderson itself observed that

> [r]educed competition will hurt publishers and retailers alike. When competition is eliminated without regulatory oversight all parties lose. Competition is the driving force to innovation and efficiency. Without competition, retailers and publishers risk their existing discounts and the category will lose its relevancy to retailers. Display space will be lost to competing consumer products.

*Id.* at 299 (Anderson's January 26, 2009 letter to publishers). We are attentive to the legal principle that the "weight [to] be assigned to competing permissible inferences remains within the province of the fact-finder at a trial." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987). But "some assessing of the evidence is necessary in order to determine rationally what inferences are reasonable and therefore permissible." *Id.*

25

Dr. Marx's report thus presents evidence suggesting only that reducing competition in the wholesaler market could result in higher prices for retailers; it does not show that reducing competition would in any way benefit or has already benefited defendant publishers.

In *AD/SAT, Division of Skylight, Inc. v. Associated Press*, we encountered at summary judgment and rejected a claim that was similarly speculative. 181 F.3d 216, 235 (2d Cir. 1999). There, plaintiff AD/SAT claimed that defendants, newspapers affiliated with the Associated Press ("AP"), engaged in a group boycott against AD/SAT, an advertising broker for newspapers, to benefit a subsidiary of AP that provided the same services; the defendants desired to do so, allegedly, because the newspapers were dues-paying members of AP. *Id.* AD/SAT theorized that the newspapers would enjoy lower AP dues if the AP subsidiary succeeded in its service business. *Id.* In light of the minimal economic benefit that AP members would realize under the scenario, we reasoned that "the factual context of each defendant's decision to terminate, or attempt to terminate, its relationship with AD/SAT strongly suggests that the newspaper defendants had no rational economic motive to join the alleged conspiracies." *Id.*

Here, as in *AD/SAT*, even accepting Dr. Marx's theory as possible, the benefit (or, perhaps, harm) that might accrue to defendants from reducing competition among wholesalers strikes us as sufficiently speculative that businesses in defendants' position would have no rational economic motive to join a conspiracy to drive Anderson out of business. We are not persuaded that some "hope" that reduced competition in the wholesaler market might eventually work in defendants' favor "can be said to be a rational motive for joining the conspirac[y] alleged in this case." *Id.* at 235; *see, e.g.*, *Eichman v. Fotomat Corp.*, 880 F.2d 149, 161-62 (9th Cir. 1989) (finding implausible a

26

conspiracy between Fotomat and processors to drive franchisees out of business because franchisees generated sales for processors); *see also infra* section I.B.i (discussing unlikely motive to conspire). The kind of broad inferences Anderson urges upon us and that would be permitted if the conspiracy were economically sensible are not appropriate here. *See Publ'n Paper*, 690 F.3d at 63. As we have highlighted, carefully circumscribing the range of inferences permissible in the antitrust context is especially important where, as here, the challenged conduct—moving business away from a higher cost provider—"often is the very essence of competition." *Matsushita*, 475 U.S. at 594. "Thus, mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Id.* Under these circumstances, Anderson must "come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." *Id.* at 587. Such evidence must "tend[] to exclude the possibility that the defendants acted independently." *AD/SAT*, 181 F.3d at 233. We turn to examining the available evidence.

## B. Evidence of agreement

Given our conclusion that the alleged agreement was implausible, we consider whether the evidence presented is nonetheless sufficient to provide a basis for a reasonable jury to find it more likely than not that defendants ceased doing business with Anderson as a result of a "common scheme designed to achieve an unlawful objective." *Apple*, 791 F.3d at 315. Here, their objective would be to reduce competition in the wholesaler market by driving Anderson out of business. The evidence must tend to exclude the possibility that defendants acted independently and declined to pay the surcharge simply for economic reasons.

27

The conduct complained of here—refusing to accede to the terms of Anderson's Program on a long-term basis by February 1, 2009—is in our view equally consistent with both a conspiratorial explanation and an independent-action explanation. As we noted in *Anderson II*, a business entity "has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Anderson II*, 680 F.3d at 183 (quoting *Monsanto*, 465 U.S. at 761) (emphasis omitted). Anderson was not willing, as defendants point out, "to do business with [them] on the same terms as the plaintiff's competitors." Time & Hearst Br. 45. Anderson's proposed surcharge thus provides a legitimate and compelling explanation for each defendant to refuse to deal with Anderson. *See AD/SAT*, 181 F.3d at 240 (concluding that availability of "more cost-effective" providers is a "valid business reason[]" for terminating relationship); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 279 (1968) ("Obviously it would not have been evidence of conspiracy if Cities refused to deal with Waldron because the price at which he proposed to sell oil was in excess of that at which oil could be obtained from others.").

Given Anderson's declared financial instability, and the tight deadline imposed by the terms of Anderson's Program, each defendant also had a legitimate business reason to constantly monitor competitors' behavior to determine Anderson's ongoing viability as part of its own independent assessment of whether to accede to the Program's terms. *See, e.g., In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015) ("We can, . . . without suspecting illegal collusion, expect competing firms to keep close track of each other's pricing and other market behavior and often to find it in their self-interest to imitate that behavior rather than try to undermine it . . . ."); *Michelman v. Clark-Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1048 (2d Cir. 1976) ("Given the legitimate

28

function of [creditworthiness] data [of customers, to protect sellers from risk exposure], it is not a violation of [Sherman Act §] 1 to exchange such information, provided that any action taken in reliance upon it is the result of each firm's independent judgment, and not of agreement."). And the retailers' past preference for maintaining an exclusive relationship with a single wholesaler provides a legitimate reason for defendants' lobbying efforts to persuade each other and also retailers—which Anderson had already pressured to hold firm in their earlier practice—to consider dealing with an alternative wholesaler. *See Interborough News Co. v. Curtis Publ'g Co.*, 225 F.2d 289, 293 (2d Cir. 1955) (concluding that encouraging other business to "patronize" a new wholesaler was lawful).

Anderson's failure to offer competitive terms does not, however, immunize defendants from antitrust liability, as we have earlier said. *Anderson II*, 680 F.3d at 192. If Anderson presents evidence that sufficiently tends to exclude the legitimate explanations and tends to prove that defendants entered into an agreement to reduce competition in the wholesaler market by driving Anderson out of business, defendants could still be liable for a Sherman Act violation. *See Apple*, 791 F.3d at 313-15; *Matshushita*, 475 U.S. at 588.

Absent direct evidence of conspiracy, such as an admission by one of the defendants, antitrust plaintiffs must rely on circumstantial evidence to support their conspiracy claims. *See Apple*, 791 F.3d at 315 (discussing examples of direct or "circumstantial facts supporting the inference that a conspiracy existed" (quoting *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013)) (emphasis omitted)). One powerful form of circumstantial evidence is parallel action— proof that defendants took identical actions within a time period suggestive of

29

prearrangement. But "[p]arallel action is not, by itself, sufficient to prove the existence of a conspiracy; such behavior could be the result of coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Id.* at 315 (internal quotation marks omitted). Accordingly, when defendants' parallel behavior forms the basis for a Sherman Act claim, "a plaintiff must show additional circumstances"—so-called "plus factors"—which, "when viewed in conjunction with the parallel conduct, would permit a fact-finder to infer a conspiracy." *Publ'n Paper*, 690 F.3d at 62. These circumstances may include traditional evidence of conspiracy: statements permitting an inference that the defendants entered into an agreement. They may also include evidence of other circumstances giving rise to a less direct inference of conspiracy, such as "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Apple*, 791 F.3d at 315.

In challenging the District Court's grant of summary judgment to defendants on its claims, Anderson relies on three types of evidence that it presents as reflecting an unlawful agreement: defendants' parallel conduct, as evidenced by their allegedly simultaneous cessation of business with Anderson; certain of defendants' contemporaneous statements, which Anderson argues provides "strong evidence of a collusive scheme"; and evidence of other "plus factors" suggesting that conditions conducive to collusion existed in the single-copy magazine market. After evaluating the evidence of defendants' conduct, statements, and plus factors as a whole, we conclude that Anderson has not offered "sufficient evidence to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not." *Publ'n Paper*, 690 F.3d

30

at 63; *see also Apple, Inc.*, 791 F.3d at 315. The evidence is thus not sufficient for Anderson to survive a motion for summary judgment. *See Publ'n Paper*, 690 F.3d at 63.

### i.  Ambiguous conduct and communications

We consider the first two forms of evidence together: defendants' conduct and communications must be evaluated in context and with the "overall picture" in mind. Areeda & Hovenkamp, *Antitrust Law*, ¶ 308, at 171; *Apple, Inc.*, 791 F.3d at 315 ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962))). After evaluating the evidence against each defendant to consider the question of "who was in agreement with whom and about what" and at what point in time, the picture that emerges is too murky for us to conclude that evidence is anything other than ambiguous. *See* Areeda & Hovenkamp, *Antitrust Law*, ¶ 1409, at 64. A jury could permissibly infer two conclusions from the evidence in this case: (1) an illegal agreement to boycott Anderson; or (2) legal, independent business decisions to reject Anderson's higher cost Program in favor of lower cost alternatives. A jury's choice between these two equally likely explanations for defendants' conduct, one legal and one illegal, would "amount to mere speculation." *See, e.g., Apex Oil*, 822 F.2d at 258 (concluding as to one defendant that "inferring the existence of a conspiracy from the remaining conversations would amount to mere speculation").

Anderson's theory is that all of the defendants (publishers and distributors alike) were in agreement with each other to put Anderson out of business and create a two-

wholesaler system, and that they made this agreement on January 15, 2009.[4] Anderson then argues that the evidence of defendants' parallel conduct and their allegedly incriminating communications allow us to infer that the defendants entered into this agreement. We find this argument unconvincing.

First, defendants' conduct was not, in fact, parallel. At the motion to dismiss stage, we observed that Anderson's "key parallel conduct allegation was that all of the publisher and distributor defendants ceased doing business with Anderson . . . within a span of three business days . . . ." *Anderson II*, 680 F.3d at 191 (emphasis and internal quotation marks omitted). But the evidence presented at summary judgment undercuts that allegation and suggests that (1) defendants' responses to Anderson's Program were not uniform, and (2) the tight timeframe for those responses—between January 12–14 and February 1—was of Anderson's own making, not the result of an unlawful agreement. The defendants each reacted in different ways to Anderson's Program: Many defendants (Time/TWR, Kable, AMI) undertook independent efforts to negotiate with Anderson. Some defendants (AMI, Hachette, Curtis, Rodale) even agreed to temporarily pay the surcharge required by Anderson and to distribute magazines

---

[4] Anderson asserts that the district court erred in observing that "Anderson cannot say when the alleged conspiracy started." *See* Appellants' Br. 47–48 n.12 (quoting *Anderson News III*, 123 F. Supp. at 486) ("[T]he evidence indicates the defendants reached agreement by January 15—the day that Parker reported that 'no one will ag[r]ee' to Anderson's proposal."); *see also* Appellants' Reply Br. 46 (the "jury could conclude that the conspiracy was fully formed by January 15"). But Anderson shifts away from the January 15 date when it is convenient—for example, it argues that Time/TWR and Kable did not make their final decisions until February 1, *id.* at 38, 39, and that Bauer did not make its final decision until January 31, *id.* at 44–45. These inconsistencies highlight the fundamental ambiguity of the record before us. Since February 1 was Anderson's threatened shipment cutoff date, the fact that defendants tended to make their decisions around that date just as likely reflected a legitimate reaction to Anderson's Program as it was evidence of collusive behavior.

through Anderson for the month of February. That these varying courses of action occurred undermines Anderson's assertion that defendants' "parallel" conduct supports an inference of a conspiracy to drive Anderson out of business.

Next, considering defendants' communications in the context of their nonparallel conduct, defendants' actions are at least equally consistent with legitimate, independent, and procompetitive action to reject Anderson's Program by seeking alternative wholesalers that could offer better terms, as with conspiratorial action. Because Anderson gave publishers only two weeks to consider the Program, it was reasonable (and probably prudent) for industry players to gather information about how the market would react and to plan for the possibility that negotiations with Anderson would be unsuccessful and Anderson would follow through on its threat to cut off distribution. In line with this reasoning, courts have rejected arguments that an antitrust claim can survive summary judgment based on evidence that defendants monitored competitors' behavior, *In re Text Messaging Antitrust Litig.*, 782 F.3d at 879, engaged in conscious parallelism, *Apex Oil Co.*, 822 F.2d at 252, attempted to persuade others to switch to an alternative wholesaler, *Interborough News Co.*, 225 F.2d at 293, or communicated extensively with a distributor, *Monsanto Co.*, 465 U.S. at 762.

Finally, we consider the factual context of each defendant's actions and communications during the short timeframe between Anderson's announcements of its Program from January 12 to 14, and Anderson's implementation of its "going dark" strategy, cutting off its magazine deliveries after February 1, 2009. *See AD/SAT*, 181 F.3d at 234 ("[W]e require a factual showing that each defendant conspired in violation of the antitrust laws, and have not adopted a 'walking conspiracy' theory in place of such a showing."). On this record, Anderson has failed to present sufficient evidence to show

33

that it was more likely than not that defendants agreed on January 15 to put Anderson out of business and reduce wholesaler competition. *Publ'n Paper*, 690 F.3d at 63. We discuss below samples of the evidence adduced.

**1) Time/TWR**

Evidence in the record as it relates to Time/TWR can be interpreted as either supporting or refuting the inference of an illegal conspiracy. Anderson highlights third party testimony against Time/TWR, but much of that testimony is ambiguous. For example, David Rustad, the President of Qrius Concepts (which handled sales for the retailer Kroger), testified that TWR President Richard Jacobsen told him that "no publishers were going to support the 7-cent surcharge" and that "they were going to teach [Anderson] a lesson." J.A. 2087, 2089. However, Rustad's testimony also points the other way: Rustad testified as well that Jacobsen articulated legitimate business reasons for why no one would support the charge because Anderson's "demands were unrealistic . . . . [T]hey had given Anderson News previous concessions already, and . . . there[] [was] no way they could give additional concessions to Anderson News . . . ." *Id.* at 2089.

Rustad further acknowledged that everyone in the industry, including Kroger, was "trying to dig into" the question of which publishers would acquiesce to the Program "because there was a little bit of contradictory information" and Kroger was "trying to understand what [it was] going to do as well in the event [Anderson] went out of business." *Id.* at 2087-88. This is consistent with legitimate industry monitoring behavior and, therefore, is not evidence (much less persuasive evidence) of conspiracy. *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 782 F.3d at 879 ("We can . . ., without suspecting illegal collusion, expect competing firms to keep close track of each other's

34

pricing and other market behavior . . . ."); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) ("Gathering competitors' price information can be consistent with independent competitive behavior.").

Other evidence in the record also tends to contradict Anderson's theory that Time/TWR agreed with the other defendants to boycott Anderson. For example, on January 27, 2009, TWR sent a letter to Anderson asking for "a short period of time during which we could negotiate terms on which Anderson News Company could continue to serve as wholesaler for Time Inc. publications." J.A. 1966. TWR noted that it was "so interested in attempting to reach an agreement with you that instead of proposing a standstill, we are proposing a standstill in which we are providing you with an additional two points of discount on Time Inc. weekly magazines. We hope that you value our relationship sufficiently to allow us a brief period of time to work out a mutually beneficial agreement." *Id.* That same day, Time CEO Ann Moore called Mr. Anderson's brother, Clyde Anderson, to make sure Time's request would not "fall through the cracks," and in the hopes that Clyde Anderson could "save the day." C.A. 1453. After Anderson rejected TWR's proposal, TWR sent a letter to Anderson advising that TWR would no longer ship Time publications to Anderson "[i]n view of [its] unwillingness to suspend the new fee structure . . . even for a short period of time to allow us to attempt to work out a long-term distribution agreement . . . ." J.A. 1467.

Anderson argues that TWR's failed proposal represents a mere "contingency plan in the event the agreement [to boycott] collapsed." Appellants' Reply Br. 48. But it seems at least equally likely that Time/TWR was genuinely interested in continuing its relationship with Anderson when it made this final counterproposal on January 27,

35

2009—twelve days after (as Anderson alleges) Time/TWR agreed with the other defendants to boycott Anderson.

### 2) Curtis

The evidence presented against Curtis is similarly ambiguous. For example, Source President James Gillis testified that Curtis CEO Bob Castardi told him, "If Rick [Jacobsen, of TWR] says right, I go right. If he says left, I go left. We're in lockstep. We're doing this together." J.A. 1359. Mr. Anderson also testified that Castardi told him, "Rich [Jacobsen, of TWR] and I are working together on this." *Id.* at 251. Castardi himself testified, however, that Curtis was compelled by economic realities—not necessarily a conspiratorial agreement—to follow Time/TWR. Given Time/TWR's significance in the single-issue magazine copy market, Castardi concluded that its decision alone not to ship to Anderson would put Anderson out of business, rendering Anderson "not . . . a viable place for [Curtis] to send [its] product." C.A. 160; *see also Joseph E. Seagram & Sons v. Hawaiian Oke and Liquors, Ltd.*, 416 F.2d 71, 80 (9th Cir. 1969) ("A supplier who becomes dissatisfied with an existing distributor . . . has a legitimate interest in seeing that any new distributor to which it might turn would be viable. Manufacturers' or suppliers' decisions about the distribution of their products are not made in a vacuu[m]." (internal quotation marks omitted)).

Curtis also presented evidence that tends to exclude the possibility that it joined a conspiracy to boycott Anderson on January 15. Emails indicate that Castardi attempted to negotiate with Anderson at least a few times during the period from January 21 to 26, noting that "I have been asking for discussions with [Mr. Anderson] for the past week; to no avail. . . . As I said in the [Jan. 21] meeting, the vast majority of our clients have adamantly decline[d] you[r] offer without any influence from Curtis."

36

J.A. 640; *see also id.* at 793, 795, 801. An internal email between Anderson News President Frank Stockard and Mr. Anderson noted that Castardi "[s]aid he is trying to help." *Id.* at 795. Mr. Anderson did not respond to Castardi's email. *Id.* at 292.

In addition to expressing interest in negotiating with Anderson, Curtis helped facilitate shipments for those of its client publishers, including Rodale and Hachette, that were willing to pay Anderson's $0.07 surcharge for the month of February. Curtis's willingness to facilitate some shipments to Anderson even after the cutoff date of February 1 cuts against Anderson's theory that Curtis entered an unlawful agreement with the other defendants on January 15 with the goal of putting Anderson out of business.

### 3) Kable

Anderson criticizes Kable for statements that, it contends, demonstrate Kable's involvement in a conspiracy. Such statements arise primarily out of Kable's communications that share information with its competitors, such as an email to Bauer Vice President Richard Parker relating that Kable's clients were "cutting of[f] Source and [Anderson]." C.A. 2854. As discussed above, this sort of information-sharing can be legitimate monitoring behavior. For example, Anderson makes much of Kable CEO Michael Duloc's reference in a January 16, 2009 email to "[t]he plan" involving "Bauer (and AMI)." *See* Appellants' Reply Br. 39; C.A. 2798. But Duloc's email is hardly a smoking gun. Duloc responded to an email asking about other publishers' plans to pay the $0.07 surcharge by explaining that "[t]he plan for Bauer (and AMI) is to[] not pay but ship. Let Anderson be the one to not deliver and then explain to retailers as opposed to publishers looking like the bad guy by not shipping." C.A. 2798. The reference to "the plan," viewed in context, seems to mean each publisher's independent

plan, rather than a conspiracy among all of the defendants; it is discussed in the context of monitoring other industry players' behavior to determine how to calibrate Kable's actions. Furthermore, the "plan" as articulated here is to proceed with shipments to Anderson while ignoring the surcharge imposed by Anderson's Program, which is not consistent with Anderson's theory that the defendants agreed among themselves on January 15 that they would halt business with Anderson.

Internal emails at Kable also confirm that on January 14—the day before Kable is alleged to have entered an illegal agreement to boycott Anderson—Duloc specifically instructed an employee not to advise publisher-clients to reject Anderson's Program, expressing concern about a debt of $10 million owed by Anderson to Kable. Other evidence—including emails between Duloc and Anderson News President Stockard— suggests that Kable attempted to negotiate with Anderson on January 28, which is in tension with the theory that Kable had agreed to boycott Anderson on January 15. And, finally, as late as January 31, Duloc left open the possibility that it might stick with Anderson if Time changed course.

### 4) AMI/DSI

Anderson argues that communications between distributor DSI and its publisher-clients (AMI, Bauer, Rodale, and Hachette) constitute evidence of a conspiracy. We find these communications, too, ambiguous at best, however.

In an email to AMI CEO David Pecker, DSI President Mike Porche noted that Bauer "believes we should start simultaneously using our collective resources and influence to direct business towards [TNG-Wholesaler]." C.A. 1778. In the same email, Porche informed Pecker that Bauer agreed that a "strategy . . . of first offering to test reducing costs for wholesalers by eliminating a large portion of their one way freight

and return processing costs"—a test that, in the end, did not happen—"makes sense." *Id.* Porche acknowledged that, if the cost-reduction plan did not work, "we have little option other than to develop our own cooperative distribution system." *Id.* This email is ambiguous at best: it demonstrates that, far from agreeing to a boycott with the goal of driving Anderson out of business, defendants had considered a plan to help make Anderson's business viable. Their concurrent consideration of how they might deal with preparing for the worst-case scenario of having to develop a backup wholesaler is not precluded by antitrust law.

Moreover, the evidence of coordination to which Anderson points is equally consistent with lawful activities. For example, DSI prepared a "Script for Wal-Mart" and persuaded two of its publisher-clients, AMI and Bauer, to place their own phone calls to the retailer. C.A. 2722. Although the similarities between AMI and Bauer's phone calls with Wal-Mart could suggest that they were acting to further a conspiracy, the use of a script is as consistent with a legitimate business activity—ensuring continued access to a major retailer if they switched to a new wholesaler—as with an alleged unlawful boycott. That DSI as a distributor aided AMI and Bauer in their communications with Wal-Mart is hardly convincing evidence that these parties also entered into a separate agreement with the goal of putting Anderson out of business.

As late as January 26, DSI documented in an email between Porche and consultant Mike Roscoe how industry players still remained uncertain about whether to accept Anderson's Program. Porche observed that "Curtis and Bauer both think not shipping Anderson is a mistake" and that he himself had also "gone back and forth" on the decision. C.A. 1788. At the end of the email, Porche also observed that "nobody knows what is going to happen, what I expect to see assuming Bauer and AMI ship is

39

that Anderson will ship some product and not ship others[,] making examples of certain publishers. That is not going to go over very well for the publisher not distributed . . . ." *Id.* This observation illustrates why industry monitoring was required: each defendant had to independently determine the right business decision *for it*, based on what was happening in the industry overall. *See In re Text Messaging Antitrust Litig.*, 782 F.3d at 879.

Similarly, the "man in bauerland" exchange cited by Anderson is consistent with efforts by AMI, DSI, and Bauer to secure a new wholesaler. On January 30, 2009, Rodale Vice President Richard Alleger emailed DSI executive Jay Wysong, asking, "Our man in bauerland still solid?" C.A. 1795. Wysong responded, "He's solid alright." *Id.* The next day, Wysong told publisher-client Bauer's Vice President, Richard Parker, "This will all work out if we can keep everyone together." C.A. 2761. To be sure, these statements could suggest that DSI's publisher-clients were checking in to make sure that everyone was following through on an illegal agreement to boycott Anderson. But the statements are equally consistent with legitimate efforts to monitor Bauer's response to the Anderson Program in order to determine the likelihood that distributor DSI would need to switch to another wholesaler and secure retailers' approval for that wholesaler.

Perhaps most tellingly, even after the cutoff date of February 1, three of DSI's four clients (AMI, Hachette, and Rodale) ultimately continued making some shipments and paying the requested surcharge to Anderson. This fact cuts deeply against Anderson's theory that AMI/DSI agreed to boycott Anderson on January 15. Although Anderson might have been dissatisfied with a mere one-month commitment to pay the surcharge (as illustrated by its argument that "a one-time payment for the magazines Anderson already possessed is far from 'exactly what Anderson News asked,'"

40

Appellants;' Reply Br. 43), DSI/AMI, Hachette, and Rodale's willingness to make *any* surcharge payments is powerfully at odds with their alleged conspiratorial intent of putting Anderson out of business.

### 5) Hachette

The evidence against Hachette is also ambiguous. For example, in a January 20, 2009 internal email to a Hachette employee, a Hachette Vice President noted that Hachette was "in constant touch with Curtis, DSI, and other publishers. . . . [T]his will come down to who blinks first[,] publishers or ANCO." C.A. 2794. These statements are as consistent with legitimate assessment of industry conditions and monitoring of competitors as with an illegal antitrust conspiracy, however. Moreover, in that same email, the Hachette executive described his plan to "see when potentially each magazine's March issues may be at risk" and "estimate [] the newsstand sales at risk" based on forthcoming updates from other publishers. *Id.* This suggests that, five days after the alleged January 15, 2009 agreement date, Hachette executives were uncertain about their competitors' plans.

More importantly, as discussed above, Hachette ultimately continued making some shipments and paying the requested surcharge to Anderson even after the cutoff date of February 1. This fact severely undermines Anderson's theory that Hachette agreed to boycott Anderson on January 15.

### 6) Bauer

Anderson points to several "incriminating communications" from Bauer. Appellants' Reply Br. 44. Like those discussed above, the communications it cites are ambiguous at best and do not "tend[] to exclude the possibility that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588. For example:

41

- After meeting with AMI and DSI on January 14, Bauer Vice President Richard Parker wrote a January 15, 2009 email to President Hubert Boehle, stating that Pecker (from AMI) was "with us," along with Ann Moore (from Time). C.A. 2737. "[A]s a matter of fact[,] no one will ag[r]ee," he noted. *Id.* Anderson, surprisingly, identifies this as the point when all of the defendants agreed to boycott Anderson. But the statement that Pecker and Moore are "with us" could either refer to an illegal conspiracy to boycott or an innocent observation that, based on the latest industry information, AMI and Time had also independently decided to reject the Anderson Program. In fact, that same day, Boehle also sent another internal email observing that "right now none of the major publishers seem responsive to Anderson's offensive. I hope it will stay that way, but I am skeptical . . . ." C.A. 2743. This suggests that his initial email about AMI and Time's plans reflected an observation, not a declaration of common intent.

- Boehle emailed Parker on January 25, noting that the Wal-Mart response "doesn't sound encouraging. Are the other publishers holding the line?" C.A. 2754. The import of the phrase "holding the line" is uncertain: on one hand, it could suggest conformity with an illegal agreement to boycott Anderson, but, on the other hand, it could be no more than an informal reference to Bauer's industry monitoring (and its related, reasonable hope that publishers would independently decide not to pay Anderson's surcharge). The context of the email provides support for the latter inference: Parker was having trouble contacting Wal-Mart and explained that Bauer "need[ed] direction from Wal-Mart for distribution beyond February 1, 2009." *Id.* at 2755. Bauer's monitoring of other industry players was necessary for it to determine whether and how to arrange an alternative distribution plan for Wal-Mart.

- Rodale Vice President Richard Alleger emailed Parker to note that Comag announced a tentative understanding with Source, and Parker responded, "Doesn't matter source won't be around much longer. Talk in the AM." C.A. 2758. This is consistent with legitimate activities: namely, monitoring industry movement and predicting how the volatile wholesaler situation would likely unfold to aid Bauer's own independent decision-making.

Bauer, moreover, was the only one among DSI's four clients that decided *not* to continue shipping (and, thus, not to pay the Anderson surcharge after February 1). Mr. Anderson also described Bauer's initial reaction as early as January 13 to be "very, very firm," noting that, in comparison to other publishers which engaged in "good dialogue" with Anderson, there was "not open dialogue" in the Anderson-Bauer meeting. J.A. 173. Bauer's actions seem, at the very least, to be equally consistent with a business strategy not to negotiate with Anderson after it made its surcharge demand as with a January 15 agreement with DSI, AMI, Hachette, and Rodale to boycott Anderson, and the fact that the others, unlike Bauer, seemed at least to consider negotiating with Anderson for ongoing deliveries after February 1 suggests that Bauer did, in fact, act alone.

### 7) Rodale

Rodale's communications, placed in context, are similarly ambiguous. In an internal email dated January 27 regarding "Wholesaler Updates," Rodale Vice President Richard Alleger observed that "[t]he situation remains very fluid." C.A. 2807. Although Alleger observed that "we all need 'People' magazine to lead the charge," *id.*, that statement could as easily be interpreted as an observation about People's market power as an implicit admission of collusion. Alleger's stated uncertainty about what would

43

happen also suggests that, as late as January 27, Rodale had not reached any agreement with the other Defendants to boycott Anderson.

Moreover, as discussed above, Rodale ultimately instructed Curtis to pay the surcharge for February 2009 and continued making shipments to Anderson even after the cutoff date of February 1. These undisputed facts cut against Anderson's theory that Rodale agreed to boycott Anderson on January 15.

*       *       *

Based on the above analysis and our review of the record, we conclude that the evidence against each defendant is at best (from Anderson's perspective) in equipoise on the question of whether defendants conspired: What Anderson offers as evidence of the conspiracy could just as easily be characterized as evidence of competition. Without more, such an ambiguous record is insufficient to withstand the scrutiny required by the Supreme Court in *Matsushita*, particularly when, as here, the alleged conspiracy makes little economic sense. We then look at the record with regard to evidence of the remaining "plus factors."

## ii.     Inconclusive plus factors

As noted earlier, because the basis of Anderson's conspiracy claim is defendants' parallel behavior, Anderson must show evidence of plus factors such as "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Apple*, 791 F.3d at 315 (quoting *Mayor & City Council of Baltimore, Md.*, 709 F.3d at 136). Anderson's arguments regarding the import of certain

44

other plus factors, which it claims bolster an inference of unlawful conspiracy, suffer from two weaknesses. First, as discussed above, we see a factual flaw: defendants did not in fact engage in parallel conduct. Without "parallel acts" to be reviewed "in conjunction with" the circumstantial evidence, *Apple*, 791 F.3d at 315 (quoting *Apex*, 822 F.2d at 253), evidence supporting the presence of certain plus factors in the single-copy magazine industry can provide little support for a finding of unlawful conspiracy. Second, even were we to view defendants' responses to the surcharge announcement as suspect parallel conduct, the evidence supporting the presence of certain plus factors— the assertions that defendants had a common motive to conspire and that defendants' conduct in declining to pay the surcharge contravened their individual self-interest, as well as the presence of increased interfirm communications in the relevant period—is also too malleable to fairly support an inference of conspiracy.

To begin, we note that the defendants had an unlikely motive to conspire, given our conclusion that the alleged conspiracy is economically implausible. A weak motive to conspire does not "save defendants who have clearly, though foolishly conspired," Areeda & Hovenkamp, *Antitrust Law*, ¶ 308, at 173-74. But "[a]s a practical matter . . . a conspiracy's 'objective rationality' or motive is a necessary condition for inferring conspiracy from the usual array of evidence, which is usually circumstantial." *Id.* at 174. Also, "[m]otive to conspire tends to be negated [1] when a defendant shows that the alleged agreement would harm the alleged conspirators; or [2] when the defendant shows a 'plausible and justifiable reason for its conduct that is consistent with proper business practice.'" *Id.* at 175-76. Here, both motive-negating factors are present. First, as discussed above, the conspiracy seems implausible because it is likely to harm the defendants by allowing wholesalers to charge higher prices, and because, even if

wholesalers charged retailers higher prices instead, that would result in a reduction of magazine sales, which would further harm the defendants. Second, it made perfect business sense for the defendants to constantly monitor industry conditions during the short-term period given by Anderson to consider its ultimatum, before ultimately deciding to independently reject Anderson's higher-cost proposal in favor of lower-cost alternatives.

After considering whether defendants had a common motive to conspire, we look again at the evidence that Anderson offers to support its assertion that the defendants' conduct was against their individual economic self-interest. Anderson again relies on Dr. Marx's report, which the District Court excluded on this point, concluding that her opinions "merely recite what is on the face of documents produced during discovery." *Anderson VI*, 2015 WL 5003528, at *4 (internal quotation marks and alterations omitted). We agree with the District Court's decision to exclude those portions of Dr. Marx's opinion that merely interpret defendants' statements. Other portions of her report contain some relevant information, however. For example, her supplemental report provides a chart comparing the sales of *People* and *US Weekly* at Source-serviced retailers in the relevant period, and showing that *US Weekly* sales increased briefly when *People* was not available in February 2009, just after the events at issue here. This temporary spurt provides at least some support for Anderson's assertion that each individual defendant might have had something to gain—at least briefly—from being one of the few magazines shipped by Anderson in February. Accordingly, to the extent the District Court excluded this portion of her opinion, we conclude that the District Court exceeded the permissible bounds of its discretion. We therefore consider this evidence as part of our *de novo* review of the record.

46

Having done so, however, we think that it accomplishes little. To show that some defendants could have enjoyed short-term gains by continuing to ship through Anderson in the month of February hardly establishes that it would be in defendants' long-term interest to accede to the proposed terms and ship to Anderson. Absent evidence regarding the long-term costs or benefits of acceding to the proposed surcharge and continuing to ship to Anderson, the inferential gap between the evidence presented to the conclusion that refusing to ship was against defendants' economic interests is simply too great. Because Anderson has not offered any evidence to bridge that gap, we decide that the evidence offered in this regard is inconclusive.

In addition, the inference that can reasonably be drawn from the increased level of interfirm communications during the two-week period between Anderson's announcement (January 14) and the deadline to accept the terms of the Program (February 1) amounts to little. Anderson argues that the "pattern and frequency" of communication between competing publishers and distributors during this period "supports an inference of conspiracy." Appellants' Br. 39. Anderson relies again on the views of Dr. Marx, who presents a chart depicting a "nearly ten-fold increase (by duration) in inter-defendant communications" during this period. *Id.* at 40 (citing C.A. 2258). Even if we take these statistics at face value as significant, what exactly they signify eludes us. Although, unlike the District Court, we cannot dismiss these calls altogether as necessarily innocent, in this context their frequency does not weigh heavily in support of an inference of unlawful conspiracy. Even when viewed in conjunction with the evidence showing that a few defendants may have attempted to conceal some communications, that there were increased communications during a compressed period created, in effect, by Anderson itself, is as consistent with

47

permissible activities, such as monitoring competitors' responses to Anderson's proposed surcharge, *see In re Text Messaging Antitrust Litig.*, 782 F.3d at 879, and creating contingency plans in case Anderson refused to rescind its surcharge, *see Interborough*, 225 F.2d at 293, as it is with an unlawful conspiracy to put Anderson out of business. Furthermore, as already discussed in subsection (i) above, each defendant's internal and interfirm communications, when properly viewed in the setting of each defendant's conduct and industry conditions, equally support inferences of competition and conspiracy.

Having considered the totality of the circumstances and the evidence offered by Anderson in support of its allegations, we conclude that a factfinder could not reasonably infer that the conspiratorial explanation is more likely than not. Although some of the evidence discussed above is suggestive of an agreement, when considered in light of the fact that the benefits of alleged conspiracy are at best speculative and the mass of evidence equally compatible with independent action, the evidence does not sufficiently "tend to exclude" the possibility that defendants acted permissibly. Accordingly, we affirm the District Court's grant of summary judgment to defendants on Anderson's Sherman Act claims.

## II. State law claims

Anderson also appeals the District Court's grant of summary judgment to defendants on its New York state law claims for tortious interference with business relations and with contract and civil conspiracy. Regarding the tortious interference claim, the District Court concluded that "[t]o the extent [Anderson] breached [its] contracts with retailers, the evidence indicates that it was Anderson's actions, not [d]efendants' actions, that caused Anderson to breach these contracts." *Anderson III*, 123

48

F. Supp. 3d at 510. As to the civil conspiracy claim, the District Court noted that New York "does not recognize an independent tort of conspiracy" and concluded that, because Anderson has not provided evidence of "an otherwise actionable tort" here—the tortious interference claim—its civil conspiracy claim failed as a matter of law. *Id.* at 510-11 (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006); *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (1986)).

Anderson argues that we should reinstate its state law claims because the District Court "rejected the tortious-interference claim based solely on its predicate antitrust holding," which Anderson argues was incorrect. Appellants' Br. 59. Because we conclude that Anderson's Sherman Act claim fails, and because Anderson has abandoned on appeal any other challenge to the substance of the District Court's grant of summary judgment on the state law claims,[5] we affirm.

III.    **Counterclaims**

Defendants AMI, Hearst, and Time (collectively, "counterclaim-plaintiffs") filed counterclaims against Anderson News and Charles Anderson, Jr., alleging that Anderson engaged in an illegal price-fixing conspiracy with Source and, in support of that conspiracy, "induced" certain retailers (that is, Kroger and Wal-Mart) to "threaten[] to boycott publishers that attempted to switch to competing wholesalers." C.A. 39-40. The counterclaim-plaintiffs allege that they suffered "tens of millions of dollars" in

---

[5] Anderson argued before the District Court that its tortious interference with contract claim could be "predicated on a plaintiff's breach of its contract with a third-party where, as here, the defendants' actions prevented the contract from being performed." J.A. 1596 (internal citations omitted). Anderson also argued that it had grounds for a tortious interference with business relations claim in defendants' disparaging comments to retailers, which, it argues, persuaded retailers to terminate their relationships with Anderson. Anderson has abandoned these claims on appeal and we do not address them further.

damages from lost sales as a result of Anderson's "going dark" strategy and because of "ongoing delivery disruptions" in the aftermath of Anderson's exit; they also incurred costs to develop "alternate distribution routes" after Anderson's demise. C.A. 38-39.

The District Court granted summary judgment to Anderson on these counterclaims, concluding that they failed as a matter of law because the counterclaim-plaintiffs had not suffered damages "of the type the antitrust laws were intended to prevent" and thus lacked antitrust standing. *Anderson III*, 123 F. Supp. 3d at 512 (quoting *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013)). We agree that counterclaim-plaintiffs lack antitrust standing.

Section 4 of the Clayton Act provides a treble-damages remedy to "[a]ny person . . . injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. Despite the statute's broad language and broad remedial purpose, *see Blue Shield of Va. v. McCready*, 457 U.S. 465, 472-73 (1982), the Supreme Court has explained that "Congress did not intend the antitrust laws to provide for all injuries that might conceivably be traced to an antitrust violation." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) (internal quotation marks omitted). The law therefore limits recovery to plaintiffs who can demonstrate that they experienced an "injury of the type the antitrust laws were intended to prevent" and that "flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.*, 429 U.S. 477, 489 (1977). A plaintiff suffers an antitrust injury only if it "is adversely affected by an *anticompetitive* aspect of the defendant's conduct." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990) (emphasis in original).

50

The District Court concluded that the injuries the counterclaim-plaintiffs alleged that they suffered—including "lost profits from sales that they would have made, but for Anderson's 'going dark' strategy" and "costs associated with making alternative arrangements to replace Anderson News and Source"—do not "'flow[] from that which makes'" Anderson's acts unlawful.[6] *Anderson III*, 123 F. Supp. 3d at 511-12. We agree. The counterclaim-plaintiffs' injuries are unrelated to the anticompetitive aspects of the two conspiracies alleged.

First, the counterclaim-plaintiffs' lost profits and withheld payments are the result of Anderson's individual conduct, not the conspiracies that Anderson is claimed to have conducted with Source. Although Anderson's conduct with Kroger and Wal-Mart, as the counterclaim-plaintiffs describe it, might reasonably be questioned, and the resulting injuries might be recoverable in some other type of action, those injuries do not arise from any sort of increase in prices or reduction in the freedom of the marketplace, and are not the type of injuries the antitrust laws were intended to prevent.

Second, the costs associated with securing an alternative wholesaler do not result from the anticompetitive aspect of either the price-fixing claim or the alleged group boycott. Selecting among competing wholesalers and ultimately switching to a lower-

---

[6] The counterclaim-plaintiffs correctly note that the District Court held that they lacked antitrust standing for another reason, too: it concluded that the counterclaim-plaintiffs would have suffered the same injuries even if Anderson had been acting alone. This basis for summary judgment was not, they argue, raised before the District Court by the parties and, therefore, could not permissibly serve as the basis for granting summary judgment since the counterclaim-plaintiffs had no notice of the ground and no opportunity to respond. Fed. R. Civ. P. 56(f). Because we agree with the District Court that the counterclaim-plaintiffs' injuries do not flow from that which makes Anderson's alleged acts unlawful, we need not address this argument.

cost wholesaler reflects the essence of competition, even if making such a switch turns out to be costly.

In an effort to avoid this straightforward conclusion, the counterclaim-plaintiffs argue that Anderson's "going dark" strategy was an "integral aspect" of its conspiracy to raise prices and to force the publishers to accept the surcharge, and that, therefore, the injuries suffered as a result of that strategy "flowed directly from the anticompetitive scheme put in place by Mr. Anderson and Anderson News." Time & Hearst Br. 71-72. The counterclaim-plaintiffs rely on *Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982), to support this claim, but their comparison to *McCready* is unavailing. In *McCready*, a putative class alleged that Blue Shield of Virginia, an insurance company, conspired with an organization of psychiatrists to boycott clinical psychologists and reduce competition in the general psychotherapy market by refusing to reimburse subscribers for visits to psychologists. *Id.* at 469-70. The lead plaintiff visited a psychologist and was denied reimbursement by her insurer. *Id.* at 475. Although the alleged conspiracy's object was to reduce competition in the psychotherapy market and the lead plaintiff's injury did not result from reduced competition, the Supreme Court held that her injuries were still "inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market" and therefore constituted an antitrust injury, because denial of reimbursement was the very mechanism by which the boycott operated. *Id.* at 484.

Here, by contrast, Anderson's "going dark" strategy was not the mechanism by which the alleged price-fixing conspiracy operated. It was, instead, one of Anderson's many levers to force publishers to accept the surcharge. Although these actions and the attendant injuries were certainly related to the alleged conspiracy, it is not enough that

the injury "be causally linked to the asserted violation." *Gatt Commc'ns*, 711 F.3d at 76 (internal quotation marks omitted). Because the counterclaim-plaintiffs' injuries resulted from an action related to, but not "inextricably intertwined with," Anderson's alleged conspiracies, they have not suffered an antitrust injury. *See id.* at 76-77 (holding that "mere termination" of a dealership agreement, alleged to be in furtherance of bid-rigging scheme, was not antitrust injury flowing from that which made the bid-rigging scheme unlawful).

Accordingly, we conclude that the counterclaim-plaintiffs lack antitrust standing to pursue the stated counterclaims. We therefore affirm the District Court's grant of summary judgment to Anderson in this regard.

**CONCLUSION**

In sum, the evidence presented by Anderson, while perhaps consistent with an unlawful conspiracy among defendants, does not sufficiently "tend[] to exclude" other interpretations of the events that took place in the single-copy magazine industry during several hectic weeks in January 2009. When it introduced the Program, Anderson sought to significantly change the state of the market by suddenly seeking to impose a surcharge and setting an immediate deadline for publishers to take it or leave it. It is not surprising that defendants quickly rejected the proposal in favor of switching to existing wholesalers without surcharges, refusing to accept the terms of Anderson's new business model. No reasonable jury could find on this record that the defendants entered into "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Apple*, 791 F.3d at 315.

For this reason and those discussed above, we **AFFIRM** the District Court's judgments.